Mable McDANIEL et al., Appellants,

v.

D. L. ROSE, Appellee.

No. 3356.

Court of Civil Appeals of Texas.

Eastland.

June 27, 1958.

Rehearing Denied July 18, 1958.

369

McDaniel, Hunt & Fairchild, Center, Leon B. Douglas, State's Atty., Austin, for appellants.

W. W. Blanton, Odessa, Turner & Seaberry, Eastland, for appellee.

WALTER, Justice.

The judgment heretofore entered herein on May 30, 1958, is set aside and the original opinion withdrawn and this opinion will be substituted for the original.

This suit was filed by D. L. Rose against R. D. McDaniel to annul and terminate a contract executed by them on September 25, 1949. After the suit was filed R. D. McDaniel died intestate and his widow, Mable McDaniel, and his children, Dean McDaniel and Evelyn M. Stevens and her husband, B. R. Stevens, were substituted for him as defendants and cross-plaintiffs.

The material provisions of the contract are as follows:

"That the parties hereto hereby undertake and consent to a working agreement for a joint enterprise in the business of drilling oil and gas wells and producing oil and gas, which said agreement shall, in the manner, at the time, and under the hereinafter named conditions, culminate in a partnership wherein the proportionate ownership of the parties hereto, in and of the assets, liabilities, and profits of the

same shall be as follows; to-wit: D. L. Rose, 75 per cent, therof; R. D. McDaniels, 25 per cent, thereof; it being expressly understood and agreed that ownership of all the assets of the said enterprise shall be and remain the property of D. L. Rose until the said D. L. Rose shall have been fully paid for the property and funds contributed by him to the said enterprise.

"That the said D. L. Rose has put into said enterprise, as capital stock, a rotary drilling rig of the value of ninety thousand dollars ($90,000.00), and will invest such further property or sums as shall be necessary and appropriate to the operation of the business, and will exercise the powers of general manager of said enterprise, at all times during the continuance of this business agreement both before and after the assets of the enterprise shall have been fully paid for; it being expressly understood and agreed, however, that the said D. L. Rose shall not be restricted in his right to carry on his other business of any nature whatsoever, inasmuch as this enterprise is joint only insofar as it covers the property herein described and the efforts of the parties herein agreed upon.

"That the said R. D. McDaniels will, at all times during the continuance of this agreement, use his undivided and utmost endeavors to the best of his skill and ability to promote and enhance the mutual interest of the parties hereto and will not, at any time during the continuance of this agreement, exercise or follow the said trade or business, or any other, to his private benefit or advantage.

"That in all matters respecting the several transactions of the enterprise and the management of the business thereof, the said D. L. Rose shall exercise complete managerial and supervisory control at all times, and the said D. L. Rose shall be responsible for and shall provide for the keeping of separate and accurate books of account wherein shall be entered and set down an account of all the money and property invested, received, and expended in and about the said business, and all other matters and things in any wise belonging or appertaining thereto and either of the parties may have access to said books. It is further expressly agreed that no contract or indebtedness on behalf of the said business shall be created or made without the consent of the said D. L. Rose.

"That it shall be lawful for each of the parties hereto to take out of the enterprise a maximum of four hundred dollars ($400.00), during any one calendar month, to his own us, the same to be charged on account, excepting that the expenses of conducting the business of the enterprise, when said expenses are carefully and accurately itemized, may be taken out of the cash of the enterprise. The maximum of $400.00 permissible to be withdrawn to the own use of either party in any one calendar month shall be cumulative from month to month."

The plaintiff also pleaded a written instrument executed by the plaintiff and McDaniel on February 15, 1955; the material portions of which are as follows:

"And Whereas, it is desired on this 15th day of February, 1955, that the said D. L. Rose and R. D. McDaniels enter into this agreement showing the condition of the business of said D. L. Rose Drilling Contractor;

"Now, Therefore, for and in consideration of the premises, it is mutually agreed by D. L. Rose and R. D. McDaniels, as follows:

"The assets of said D. L. Rose Drilling Contractor consists of the following items:

"1. Rig No. 1—power rotary drilling rig and equipment identified from draw-works unit as a Unit Rig Model U–15,

powered by two Buda Gas Engines, Model P.C. 1879, as fully described in Exhibit 'A', which is attached hereto and made a part hereof;

"2. Rig No. 2—power rotary drilling rig and equipment identified from draw-works unit as being a Bethlehem, Model S–55 powered by two GM, Model 12103 twin diesel engines, as fully described in Exhibit 'B', which is attached hereto and made a part hereof;

"3. An undivided $^{44}\!/_{64}$ interest in an oil and gas lease executed February 27, 1947, by Lillian Leech Porter, et al, as Lessors, to Danciger Oil and Refining Company, as Lessee, insofar as said lease covers the East ½ of the Southeast ¼ and the West ½ of the Northeast ¼ of Section No. 22, Lunatic Asylum Lands in Shackelford County, Texas, said lease being recorded in Book 138, page 428, Deed Records of Shackelford County, Texas;

"4. An undivided ⅓ interest in an oil and gas lease covering the following described land in Nolan County, Texas:

Being out of the South part of Section 43 and 44 in Block 22, T. & P. R. R. Co. Surveys, and more particularly described as follows:

(field notes omitted)

and containing 282.3 acres, more or less, and being the Nemir Lease in said county;

"5. Oil payment of $25.00 per acre, payable out of $^{1}\!/_{64}$ of ⅞ of all the oil produced from an oil and gas lease dated April 14, 1949, executed by A. E. Jones, et al, as Lessors, to Thomas G. McCurdy and John C. McCurdy as Lessees, insofar as it covers the following described land in Coleman County, Texas:

"(1) West ½ of the S.E. ¼ of Sec. 16, T&NO RR Company Survey;

"(2) East 40 acres of West ½ of N.E. ¼ of said Section 16, T&NO RR Company Survey;

"(3) East 80 Acres and West 80 acres of South ½ of Section 15, T&NO RR Company Survey;

"6. One Bethlehem No. 300 mud pump;

"7. One 1954 Oldsmobile '88';

"8. One 1954 Oldsmobile '98'.

"The liabilities of D. L. Rose Drilling Contractor are as follows:

"1. Amount owed to D. L. Rose, personally—$27,000.00;

"2. Amount owed to D. L. Rose Trucking Contractor—$10,000.00;

"3. Amount owed to Bethlehem Supply Company—$9,000.00, which note is payable at the rate of $2,000.00 per month;

"4. Amount owed to The First National Bank of Albany—$15,000.00, as evidenced by demand notes;

"There are some small current operating debts outstanding as of February 15, 1955, which are not listed herein.

"It is agreed that the above statement of condition of the business of D. L. Rose Drilling Contractor shall be binding upon both parties hereto as showing a complete statement of condition of D. L. Rose Drilling Contractor as of February 15, 1955. This agreement shall be supplemental to the agreement made and entered into on September 25, 1949, between D. L. Rose and R. D. McDaniels and the said agreement, dated September 25, 1949, shall remain in full force and effect until the terms and conditions thereof have been complied with.

"In Testimony Whereof, witness our hands in duplicate this the 15th day of February, A.D. 1955.

"/s/ D. L. Rose
/s/ R. D. McDaniel

"Witnesses:
/s/ Agnes Howard
/s/ Agnes Howard"

He then alleged that shortly after the execution of the first contract McDaniel

secretly breached it by fraudulently entering into agreements with certain people concerning drilling bits belonging to D. L. Rose Drilling Contractor and involving alleged kick-backs. Plaintiff pleaded a statement made by McDaniel concerning the bits and the kick-backs, which is as follows:

"The State of Texas
  County of Taylor

The State of Texas
v.
R. D. McDaniel

"Be it remembered that I, R. D. McDaniel, having been placed under arrest on a charge of Felony Theft, do hereby make the following statement to Wiley L. Caffey, District Attorney, after having been informed by the nature of the accusation against me, and I certify that before making said statement, I was duly warned by Wiley L. Caffey that I did not have to make any statement at all, with reference to the said accusation against me, but that if I did make such statement that same would be reduced to writing and signed by me, and could be used in evidence against me on my trial for the offense concerning which this confession is herein made.

"That my voluntary statement with reference to the accusation against me as follows:
"My name is R. D. McDaniel, I am 49 years of age. I am married, and living with my wife, I have two children both grown. I reside in Albany, Texas.

"I made an agreement with Floyd O. Mitchell of Abilene, Texas, for him to send the bill in, and they would mail Floyd O. Mitchell a check, that is D. L. Rose office would mail him a check, then he would pay me my part of it, this was for bits used on the Rose Drilling Company rigs. I would pick the bits up and take them to the rig and we would use them, when they were pulled out of the hole they would be used up, and I would then leave them on the location for the Hughes Tool men to pick up. These were bits I had stored over at Albany, and I would put them in the Company car and take them to the rig. I would pay Floyd Mitchell 15% of the price of the bits. These bits belonged to the drilling company, D. L. Rose Drilling Company. I would have Rose Drilling Company bits re-tipped and was selling them back to the D. L. Rose Drilling Company. I was re-selling to Rose Drilling Company some re-tipped bits and some re-run bits that Rose Drilling Company already owned three-fourths interest in, and I knew I was doing wrong when I did it. There were 79 bits that I handled this way with Floyd Mitchell, and these bits came from different counties including Runnels and Shackelford counties.
                              "R. D. McDaniel

"I had about the same agreement and arrangement with Lois Maurine Chatwell of Abilene, Texas, for selling bits to Rose Drilling Company, except that most of the bits were re-run bits and two of them were new bits. I think there were about $6,000.-00 worth of these bits that I sold to Rose Drilling Company through her. I paid her 15%, and kept the balance. Rose Drilling Company owned three-fourths interest in these bits that I was selling back to them. You are showing me some statements of L. M. Chatwell to D. L. Rose Drilling Company, showing description and price, selling price, of some of the bits I have been referring to and I now affix my initials to these statements and make them a part of this statement to save time and space. I knew I was doing wrong in selling these bits back to Rose Drilling Company.

"You are also showing me some statements of Bud Mitchell Welding Company to Rose Drilling Company of Albany, Texas, showing the description of bits and selling price, that I have made a statement about above herein, and I affix my signature, or rather my initials to these statements and agree for them to be made a part of this statement in order to save time.

"In addition to the above the officers have seized about 90 bits that I had stored at one

place in Abilene and one place in Albany, and of these I gathered some from Rose Drilling Company rigs, some of them I bought from Curley Henderson of Abilene, and five of them I bought from Harold Roach, a re-tipper at Albany. I intended to sell all these bits to D. L. Rose Drilling Company.

"The two new bits above referred to I bought from Curley Henderson.

"Witness my hand this 5th day of May, 1957.

          "R. D. McDaniel

"Witnesses:
  Don F. Atkins
  Sid Johnson"

The defendants pleaded a general denial and alleged that under the contract executed by the parties on September 25, 1949, D. L. Rose and R. D. McDaniel became partners in the drilling business. They assert that for the years 1951, 1952, 1953 and 1954 plaintiff filed a partnership tax return showing the business as a partnership with plaintiff owning 75 per cent and R. D. McDaniel 25 per cent. The defendants also asked for title and possession of all the assets if the plaintiff was awarded a rescission of the contract. Defendants denied under oath that R. D. McDaniel executed the written instrument dated February 15, 1955, and in the alternative if he did execute same, he was not mentally capable of entering into a binding contract. In the alternative the defendants pleaded that the written contract dated February 15, 1955, was procured by fraud and deceit.

The defendants and cross-plaintiffs in their cross-action affirmed the basic contract, asked for an accounting and an injunction against Rose disposing of the partnership assets. They assert that Rose wrongfully excluded them from the partnership assets and sought to recover $2,500 per month as a reasonable rental from Rose for withholding from them the possession of said property. They further asked that a trust be impressed on the assets now standing in the name of Rose which were

purchased with partnership funds. They further asserted a cause of action against Fireman's Fund Insurance Company for $110,000, claiming a partnership rig was totally destroyed by fire and was covered by policy issued by said company.

The plaintiff denied under oath that a partnership existed and denied that he had ever been repaid for his capital and property invested in the business. He asserted that he did not learn about the "kickbacks" referred to in McDaniel's statement until the latter part of April, 1956, at which time he sought to void the contract on account of fraud and gave McDaniel written notice that the contract was terminated. He further asserted that McDaniel was an employee only and while in his employment McDaniel applied for and received workmen's compensation benefits as an employee.

The jury answered that McDaniel intended to and did perform his obligation under the contract; that he was mentally capable of and did execute the contract dated February 15, 1955, and that Rose had been repaid his investments in the business.

The defendants filed their motion for judgment on the verdict. The plaintiff filed a motion to set aside the jury's findings to issues numbers 3 and 7, that McDaniel had performed his obligation under the contract and that Rose had been repaid his investments, for a judgment on the verdict, mistrial, and for judgment non obstante veredicto. The court sustained plaintiff's motion for judgment non obstante veredicto and his motion to disregard the jury's findings to issues 3 and 7 and overruled the motions of the defendants and cross-plaintiffs. The court entered judgment that the defendants and cross-plaintiffs had no interest in the subject property and they have duly perfected their appeal from said judgment on fifteen points of error which are substantially as follows:

"This case should be reversed and rendered because the trial court erred (1) in awarding appellee the assets acquired by the parties under the contract

after awarding him cancellation of the contract (2) in overruling appellants' motion for judgment on the verdict (3) in setting aside, the finding of the jury on Special Issue No. 3 (4) in setting aside the finding of the jury on Special Issue No. 7 (5) in rendering judgment non obstante veredicto (6) in giving judgment for appellee when he neither plead nor proved that he had performed his obligations under the contract (7) in granting appellee inconsistent relief based on wholly inconsistent remedies (8) in entering judgment cancelling the contract in question because the execution of said contract was not induced by fraud (9) in rendering and entering judgment for the appellee, since appellants were entitled to their share of the profit regardless of whether or not a partnership had culminated under the terms of the original contract (10) in rendering judgment for appellee cancelling the contract without requiring that restitution be made (11) in substituting findings of fact of its own for those of the jury, and then rendering judgment thereon (12) in depriving appellants of their constitutional right of trial by jury (13) in rendering and entering judgment for the appellee when he had not filed a plea of failure of consideration under oath in regard to the original contract (14) because appellee has not come into court asking the equitable remedy of cancellation with clean hands and (15) in rendering and entering judgment for appellee when appellants were entitled to an instructed verdict as a matter of law."

The appellants have briefed fifteen points of error, but many of these are repetitious and relate to the same subject matter. We will therefore group all the points which are germane to the same subject matter.

We find 306 pages in the Transcript and 701 pages in the Statement of Facts. The appellee's brief contains this statement:

"As the attorneys for Appellee understand a jumbled, mixed-up, disconnected and almost unintelligible set of facts based upon the deposition of Mrs. Howard, which desposition, the defendants took and offered, it appears that when all debits and credits of Mrs. Rose were balanced out, he was still due the sum of $41,799.91."

After a careful study and analysis of this record, we can agree with the first part of said quoted statement. After studying and analyzing the evidence, we are unable to say that there was not some evidence of probative force to support the jury's finding to issue 7. "The rule is that, if the evidence is conflicting, but reasonable minds might differ as to its effect, still a fact issue is present." Le Master v. Fort Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224. Judge Griffin, speaking for our Supreme Court in the case of Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199, said:

"Also, to sustain the action of the trial court in granting judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon. Whiteman v. Harris, Tex.Civ.App., 123 S.W. 2d 699, writ refused; Warren v. Schawe, Tex.Civ.App., 163 S.W.2d 415, writ refused.

"'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." Stephenville, N. & S. T. Ry. Co. v. Shelton, Tex.Com.App., 208 S.W. 915, 916.' Lockley v. Page, 142 Tex. 594, 180 S.W.2d 616, 618 (1-3); also 53 Am.Jur. 143, et seq., Trial, Secs. 158 and 159."

Following the rule announced by our Supreme Court, we must search this record

to determine if there is any evidence of probative force to sustain the verdict.

Mrs. Agnes Howard had been appellee's bookkeeper since 1942. Her deposition was taken by the appellants and a portion of it was introduced by appellants and certain portions of it were introduced by the appellee. The record reveals that Mrs. Howard was present at the trial and available as a witness but neither party called her. By deposition she testified that Rose put into the D. L. Rose Rotary Contractor's account $77,263.53. She further testified that from September 25, 1949, until April 30, 1956, the business had an income from all sources, that is, from investments, drilling receipts, oil payments, sale of leases, sale of pipe and miscellaneous equipment and income from insurance of $3,260,329.48.

While testifying about income from drilling receipts for the year 1955, Mrs. Howard testified, "In 1955 we billed and were paid in full $403,849.85." But when giving the total income from drilling receipts for all years she testified that the total amounted to $2,753,194.81 and, in order to arrive at this total, the income from drilling receipts for 1955 had to be $304,849.85, instead of $403,849.85, a difference of $99,000. This evidence went into the record without objection and under the rule that the reviewing court must view the evidence in the light most favorable to the jury's verdict, we are forced to the conclusion that the jury had a right to consider the figure of $403,849.85 in arriving at its answer to issue number 7 that Rose had been repaid his investment in the business.

Both parties tried the case upon the theory that the enterprise terminated on April 30, 1956. The certificate of the court reporter who took Mrs. Howard's deposition shows that same was taken on June 28, 1956. Only income to April 30, 1956, would be material, however, Mrs. Howard's testimony concerning drilling receipts for 1956 is, "In 1956 we billed and were paid in full $135,748.39." It is impossible to determine if this represents drilling receipts to the time the deposition was taken or only drill-

ing receipts up to April 30th of that year. The jury would be authorized in assuming that this was income up to April 30, 1956, although it included income from drilling receipts to the time the deposition was taken in answering special issue number 7.

While being asked about income from the enterprise, Mrs. Howard said, "Now, did you say you would like to have the expenditures next?" Counsel for the appellant said, "No, let's get all income and all sources of income first.", and she said "All right. Now, I would have to have the books to give you the exact dates because I did not put it all down here on the work sheet, but I do have all the oil payments here." While testifying about income from oil payments, Mrs. Howard related that from a lease in Coleman County the business had received $1,561.74 and then she was asked, "That is up to now", and she answered, "That is up-to-date." Again when she testified about $20,484.81 that was received from the Leech heirs lease, she testified this was the amount paid from this lease to date. It appears that this was income received by the business up to and including the time that the deposition was given and not limited to April 30, 1956. After stating the amounts received from the different leases, she stated that it made a total of $52,100.22, but when the amounts received by her are totaled it amounts to $58,040.35. The jury was entitled under this testimony to consider the greater amount, and we are forced to hold that this kind of evidence amounted to some evidence of probative force in determining whether the court erred in granting judgment non obstante veredicto.

Testimony relative to the amount of expenses of the business is conflicting and reasonable minds might differ as to its effect. The appellants offered that portion of Mrs. Howard's deposition that could be construed to be favorable to them, and appellee offered some portions that could be favorable to him. An audit by a competent person would have been appropriate and very helpful to the trial court and jury

and to this court. However, viewing the record as it is from the standpoint of the appellants, the expenses for the entire period amounted to $3,110,448.18, but this includes a disputed item of $45,000 included in appellants' heading "miscellaneous expenses". This total amount of expenses of $3,110,448.18 does not include payment of notes to the Fort Worth National Bank of $1,920,249.16 and to the First National Bank of Albany of $144,000, which appellee contends are proper items of expense and appellants contend are payments of appellee's private debts. Viewed from the standpoint of appellants, the income from all sources of the business amounted to $3,260,329.48 and the expenses amounted to $3,110,448.18, making a difference of $149,881.30, which is in excess of the amount of money invested in this company by Mr. Rose. Reasonable minds might differ as to the effect of the testimony relative to the expenses of business, but it cannot be said that there is not some evidence of probative force upon which the jury based its answer to special issue number 7. We are compelled to hold that there was some evidence of probative force that Rose had been repaid his investments in the business as found by the jury.

Appellants ask this court to reverse the judgment of the trial court and here render judgment that they recover title and possession to all the assets of the business as of April 30, 1956, free and clear of all claims. No such judgment could be entered because under the basic contract when all the conditions precedent have been met McDaniel would be entitled to only a 25 per cent interest. However, under the 1957 amendment to Rule 324 of Texas Rules of Civil Procedure we are to consider the appellee's counter-points and make a final disposition of the case where a judgment non obstante veredicto has been erroneously rendered on the basis of the record before the court. We have considered the other points raised by appellant and find no merit in them and they are accordingly overruled.

The appellee's counter-points are as follows:

"(a) The verdict of the jury is wholly insufficient to form a basis for any judgment in favor of Appellants.

"(b) The Trial Court erred in overruling Appellee's special exceptions to the Appellants' cross-action as shown on Page 292 of the Transcript.

"(c) The Trial Court erred in overruling Appellee's motion to take as confessed Appellee's request for admissions as shown on page 71 of the Transcript.

"(d) The answer of the jury to Special Issue No. 1 is not supported by credible testimony and is so against the great preponderance of the evidence as to be the manifest result of prejudice and bias against someone.

"(e) The answer of the jury to Special Issue No. 3 is not supported by credible testimony and is so against the great preponderance of the evidence as to be the manifest result of prejudice and bias against someone.

"(f) The answer of the jury to Special Issue No. 7 is not supported by credible testimony and is so against the great preponderance of the evidence as to be the manifest result of prejudice and bias against someone.

"(g) The verdict of the jury cannot be sustained because the jury during their deliberations, were guilty of misconduct, thus vitiating their verdict."

Appellants complain about the appellee's alternate counter-points and assert that they are insufficient and object to the court's consideration of them. When we consider these alternate counter-points in connection with the appellee's entire brief,

we find them sufficient to point out the error complained of. Fambrough v. Wagley, 140 Tex. 577, 169 S.W.2d 478.

Our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661, in a per curiam opinion, sets forth the duty of a Court of Civil Appeals in exercising their constitutional powers in passing on questions of great weight and preponderance of the evidence. Our Supreme Court says:

"The question requires the Court of Civil Appeals, in the exercise of its peculiar powers under the constitution and Texas Rules of Civil Procedure Nos. 451, 453, and 455, to consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust—this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict."

"It is, indeed, not simple to describe the intellectual process to be followed by the Court of Civil Appeals in passing on the fact question—to specify just how a verdict may be supported by evidence of probative force and at the same time be on all the evidence so clearly unjust as to require a new trial. But Article 5, Sec. 6 of the Constitution, Vernon's Ann.St., is no more to be ignored than any other part of that document, and that provision, with the decisions, statutes and rules based upon it, required the Court of Civil Appeals, upon proper assignment, to consider the fact question of weight and preponderance of all the evidence and to order or deny a new trial accordingly as to the verdict may thus appear to it clearly unjust or otherwise."

After considering all the evidence we have reached the conclusion that the

jury's answer to special issue number 7 is against the great weight and preponderance of the evidence. Special issue number seven and the jury's answer is as follows:

"Do you find from a preponderance of the evidence that D. L. Rose has ever been repaid for his investments into the business involved in this case?

"Answer: 'Yes' or 'No'

"Answer: 'Yes'."

The appellants denied under oath that McDaniel executed the written instrument dated February 15, 1955, and pleaded in the alternative that if he did execute same he was not mentally capable of entering into a binding contract. The appellants also pleaded in the alternative that said written instrument was procured by fraud and deceit. The jury found against the appellants on their pleas attempting to destroy the effect of said instrument dated February 15, 1955. This instrument is, in effect, an audit of the company's business and renders certain its financial condition up to that date. This contract reveals that the business was indebted to Rose, personally, $27,000 and Mrs. Howard's uncontradicted evidence is that this amount is incorrect and should be $36,500. This written contract executed by Rose and McDaniel also shows that the business owed D. L. Rose Trucking Contractor $10,000; debts owing to other creditors in the sum of $24,000 are also shown by this instrument. Mrs. Howard testified that the withdrawals of Rose subsequent to February 15, 1955, were only $9,975.03. She further testified that from the inception of the business to April 30, 1956, the gross receipts of the business were $5,129,320.64, and that the gross expenses of the business were $5,129,072.41, leaving a net cash balance in the bank of $248.23. This would clearly demonstrate that the conditions of the contract had not been met and that the enterprise had not culminated into a partnership. No partnership was ever formally launched by the parties pursuant to the contract. The rec-

ord shows overwhelmingly by the instrument dated February 15, 1955, executed by Rose and McDaniel, and by Mrs. Howard's testimony that the conditions precedent to a partnership in the basic contract had not been met and that Rose had not been repaid for his investments. Appellee's counterpoint (f) is sustained.

The judgment is reversed and the cause remanded.